**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

|  |  |
|---|---|
| Phillips & Jordan, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Ironshore Specialty Insurance Co., Endurance American Specialty Insurance Co., Fireman's Fund Indemnity Corp., Starr Surplus Lines Insurance Co., Westchester Surplus Lines Insurance Co. <br><br> Defendants. | Case No. 2:25-cv-1044 <br><br> **JURY TRIAL REQUESTED** |

## <u>COMPLAINT</u>

Plaintiff Phillips & Jordan, Inc. ("Plaintiff" or "P&J"), by and through its attorneys, for its Complaint against Defendants Ironshore Specialty Insurance Company ("Ironshore"), Endurance American Specialty Insurance Company ("Endurance"), Fireman's Fund Indemnity Corporation ("Fireman's"), Starr Surplus Lines Insurance Company ("Starr"), and Westchester Surplus Lines Insurance Company ("Westchester" and, collectively, the Defendants or the "Carriers"), alleges, on knowledge as to its own actions, and otherwise upon information and belief, as follows:

### Preliminary Statement

1.      P&J brings two causes of action in this matter: (1) a declaratory action regarding its rights under insurance policies issued by the five defendant carriers as part of its builder's risk insurance program; and (2) a breach of contract action alleging that those insurance carriers

breached the terms of the same policies through their misapplication of various terms in the policies.

2.    This action arises out of P&J's efforts to obtain coverage for damages sustained at a public works project site following a severe storm event.

3.    The storm and resulting damage are covered under P&J's builder's risk policies.

4.    The Defendants in this action have adopted unreasonable policy interpretations and unsupportable coverage positions to deny P&J payment for its covered losses.

5.    First, Defendants have fabricated a so-called "phased" approach to the policies' valuation provisions, artificially reducing P&J's claim by millions of dollars.

6.    Second, Defendants have improperly characterized P&J's damages as resulting from the peril of "flood," as defined in the policies, and have imposed a "flood" deductible that exceeds the value of P&J's claim as calculated under their flawed methodology.

7.    Defendants have relied on their baseless and inconsistent coverage positions to incorrectly determine that no payment is owed to P&J for its covered claim.

8.    As a direct result of Defendants' actions, Plaintiff has sustained at least $5,795,028 in damages.

**Jurisdiction**

9.    This Court has jurisdiction over this action pursuant to 20 U.S.C. § 1332(a)(1), in that this is a civil action between a citizen of North Carolina and Tennessee on the one hand, and citizens of Massachusetts, Arizona, New York, Delaware, Illinois, New Jersey, Texas, Pennsylvania, and Georgia on the other hand, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

**Venue**

10.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claim occurred in Hendry County, Florida.

**The Parties**

11.    Phillips & Jordan, Inc., is a corporation that is incorporated in North Carolina and has its principal place of business in Tennessee at 10142 Parkside Drive, Suite 500, Knoxville, TN 37922. Therefore, Plaintiff is domiciled in and a citizen of North Carolina and Tennessee for the purposes of diversity jurisdiction.[1]

12.    Ironshore is a corporation that is incorporated in Arizona and has its principal place of business in Massachusetts at 175 Berkley Street, Boston, MA 02116. Therefore, Ironshore is domiciled in and a citizen of Arizona and Massachusetts for the purposes of diversity jurisdiction.

13.    Endurance is a corporation that is incorporated in Delaware and has its principal place of business in New York at 4 Manhattanville Road, Purchase, NY 10577. Therefore, Endurance is domiciled in and a citizen of Delaware and New York for the purposes of diversity jurisdiction.

14.    Fireman's is a corporation that is incorporated in New Jersey and has its principal place of business in Illinois at 225 W. Washington Street, Suite 1800, Chicago, IL 60606. Therefore, Fireman's is domiciled in and a citizen of New Jersey and Illinois for the purposes of diversity jurisdiction.

---

[1] In June 2025, Plaintiff Phillips & Jordan, Inc. changed its name to "Phillips Heavy, Inc." Because this is a breach of contract case, for the sake of clarity, Plaintiff refers to itself in this action using its name as it appears on the relevant insurance contracts ("Phillips & Jordan, Inc.").

15. Starr is a corporation that is incorporated in Texas and has its principal place of business in New York at 399 Park Avenue, 3rd Floor, New York, NY 10022. Therefore, Starr is domiciled in and a citizen of Texas and New York for the purposes of diversity jurisdiction.

16. Westchester is a corporation that is incorporated in Georgia and has its principal place of business in Pennsylvania at 436 Walnut Street, WA06T, Philadelphia, PA 19106. Therefore, Westchester is domiciled in and a citizen of Georgia and Pennsylvania for the purposes of diversity jurisdiction.

## Factual Background

### A. The Reservoir Project

13. The South Florida Water Management District (the "District") is the owner of the C-43 West Caloosahatchee Basin Storage Reservoir, Cell 1 & 2, Soil Cement Wall Project in Hendry County, Florida (the "Reservoir Project" or "Project").

14. The Reservoir Project was part of the District's efforts to improve water quality and regulate water flows into the Everglades and estuarine ecosystems.

15. On June 30, 2024, Phillips & Jordan, Inc. entered into a construction contract (contract no. 4600004809) with the District to serve as the Contractor for the Reservoir Project (the "Construction Contract" is attached as Exhibit 1).

16. The Construction Contract valued P&J's work on the Project at $143,880,000.00. (Exhibit 1).

17. The Construction Contract was comprised of the following documents:

| General Terms & Conditions | Solicitation Documents | Technical Specifications |
|---|---|---|
| General Requirements<br>Supplemental Conditions<br>Bonds & Insurance | • RFQ and Addenda<br>• Quote<br>• SBE Documents | Drawings<br>Post Award Forms |

(Exhibit 1).

18.     On July 7, 2023, the District provided Plaintiff with a notice to proceed under the Construction Contract, with an effective date of July 10, 2023 (the "Notice to Proceed" is attached as Exhibit 2).

19.     The Notice to Proceed stated that Plaintiff "shall mobilize and be working on site within ten (10) calendar days following this date, unless agreed to otherwise in writing." (Exhibit 2).

20.     The Construction Contract and the Notice to Proceed both include a deadline of 480 calendar days for "Substantial Completion" and a deadline of 540 calendar days for "Final Completion[.]" (Exhibit 1; Exhibit 2.)

21.     Both the Construction Contract and the Notice to Proceed provide for liquidated damages to be deducted from the contract price as follows: $1,000.00 per calendar day for failure to complete work by the Substantial Completion Date and $500.00 per calendar day for failure to complete work by the Final Completion Date.

22.     Pursuant to the Construction Contract and the Notice to Proceed, Plaintiff began work on the Reservoir Project in July 2023.

23.     As of May 31, 2024, Plaintiff and its subcontractors had completed about half of the Project, constructing 56,307 linear feet of the work on the embankment and the buttress for the embankment as required under the Construction Contract.

24.     Plaintiff submitted an Application for Payment to the District for the work completed through May 31, 2024 (the "Application for Payment" is attached as Exhibit 3).

25.     Plaintiff's Application for Payment valued the work completed to date at approximately $87,572,868.85. (Exhibit 3.)

26.     The May 31, 2025 Application for Payment also reflected that the total Construction Contract price had increased: from $143,880,000 to $145,629,300. (Exhibit 3.)

**B.  The June 2024 Storm Event**

25.     Beginning on June 10, 2024, the Reservoir Project worksite experienced a severe storm, with high winds and an intense rainfall causing damage to various portions of the Project (the "June 2024 Storm Event").

26.     The driving force of the wind and rainfall during the June 2024 Storm Event caused significant damage across the Reservoir Project, including damage to the under-construction reservoir embankments.

27.     The June 2024 Storm Event also caused significant damage to permanently installed work features, including the sand filter, seepage collection drain, geotextile fabric, soil cement, and batch plant stockpiles.

28.     Plaintiff quickly mobilized additional crews and equipment to mitigate further damage to permanent features, resume critical path work, and ultimately restore the Reservoir Project site to pre-June 2024 Storm Event conditions.

**C.  Plaintiff's Insurance Coverage**

29.     Plaintiff purchased a builder's risk insurance program for its work at the Reservoir Project, comprised of five insurance policies with a total limit of liability of $102,448,034, and each with a policy period of August 7, 2023, through January 1, 2025 (together, the "Policies").

30.     The builder's risk insurance policy issued by Ironshore, having policy number BRIB912955A (the "Ironshore Policy" is attached as Exhibit 4), covered twenty percent, or $20,489,607, of the Policies' total limit of liability.

31.    The builder's risk insurance policy issued by Endurance, having policy number ECV10015445800 (the "Endurance Policy" is attached as Exhibit 5), covered twenty percent, or $20,489,607, of the Policies' total limit of liability.

32.    The builder's risk insurance policy issued by Fireman's, having policy number USE00167523 (the "Fireman's Policy" is attached as Exhibit 6), covered twenty percent, or $20,489,607, of the Policies' total limit of liability.

33.    The builder's risk insurance policy issued by Starr, having policy number SLSTCON11904323 (the "Starr Policy" is attached as Exhibit 7), covered twenty percent, or $20,489,607, of the Policies' total limit of liability.

34.    The builder's risk insurance policy issued by Westchester, having policy number I23743930001 (the "Westchester Policy" is attached as Exhibit 8), covered twenty percent, or $20,489,607, of the Policies' total limit of liability.

35.    The Endurance Policy, Fireman's Policy, Starr Policy, and Westchester Policy are each "follow form" policies, which incorporate the terms and conditions of the Ironshore Policy, subject to individualized endorsements.[2]

36.    The Policies provide broad "all risks" coverage to Plaintiff.

37.    The Policies' Insuring Agreement states:

This Policy, subject to its terms, exclusions, limitations and conditions contained herein or endorsed hereto, insures against all risks of direct physical loss of or damage to property insured while at the location of the **INSURED PROJECT\***, while in offsite temporary storage or while in transit, all within the Policy territory and occurring during the Policy Period.

---

[2] Quotes from and citations to policy language refer to the Ironshore Policy, unless specifically stated otherwise.  In addition, the Ironshore Policy uses bolded font when referring to terms defined within the Policy.  When quoting policy language, all emphasis appears in original unless otherwise noted.

(Exhibit 4 at 13.)

38.    The Policies define the "Property Insured" as:

   **A.  <u>At the location of the INSURED PROJECT\*</u>:**

   1. Permanent works - All materials, supplies, equipment, machinery, and other property of a similar nature, being property of the Insured or property of others for which the Insured is contractually responsible, the value of which has been included in the estimated value of the **INSURED PROJECT\*** in Section I-9., all when used or to be used in or incidental to the demolition of existing structures, site preparation, fabrication or assembly, installation or erection or the construction of or alteration, renovation, rehabilitation of the **INSURED PROJECT\***;

   2. Temporary works – All scaffolding, form work, fences, shoring, hoarding, falsework, trailers and temporary buildings all incidental to the project and the value of which has been included in the estimated value of the **INSURED PROJECT\*** in Section I-9.

(Exhibit 4 at 13.)

39.    The Policies contain multiple "coverage extensions," including:

   **G.  <u>Debris Removal</u>:**

   Subject to the Sublimit of Liability stated in Section I-10.B.9., in the event of direct physical loss or damage insured hereunder, the Insurer will pay the following necessary and reasonable costs:

   1. Costs to remove debris of damaged insured property from the **INSURED PROJECT\*** location; and/or

   2. Cost of cleanup, at the **INSURED PROJECT\***, made necessary as a result of such direct physical loss or damage.

   3. The Company will not pay the expense to:

      a. Extract **CONTAMINANTS OR POLLUTANTS\*** from the debris; or

      b. Extract **CONTAMINANTS OR POLLUTANTS\*** from land or water; or

      c. Remove, restore or replace contaminated or polluted land or water; or

    d.  Remove or transport any property or debris to a site for storage or decontamination required because the property or debris is affected by **CONTAMINANTS OR POLLUTANTS\*** whether or not such removal, transport, or decontamination is required by law or regulation.

It is a condition precedent to recovery under this extension of coverage that the Insurer shall have paid or agreed to pay for direct physical loss or damage to the property insured hereunder and that the Insured shall give written notice to the Insurer of intent to claim for cost of removal of debris or cost to clean up not later than **180 days** after the date of such physical loss or damage.

\*\*\*

**I.**  <u>**Claims Preparation Fees**</u>**:**

Subject to the Sublimit of Liability stated in Section I-10.B.11, this Policy is extended to cover the reasonable and necessary additional expenses incurred by the Insured which are directly related to the preparation, substantiation and / or documentation of any claim for direct physical loss or damage insured hereunder. Any costs incurred for the services or efforts of a lawyer, public adjusters, or loss consultants who provide consultation on coverage or negotiate claims are expressly excluded.

The Company shall have no liability for any additional expense hereunder unless and until a claim for insured physical loss or damage to insured property has been submitted to and accepted by the Company.

**J.**  <u>**Contractor's Extra Expense**</u>**:**

Subject to the Sublimit of Liability stated in Section I-10.B.12, in the event of direct physical loss or damage insured hereunder, the Insurer will pay - Extra Expense incurred as a result of direct physical loss or damage to the **INSURED PROJECT\*** hereunder.

Extra Expense shall be defined as the reasonable and necessary excess costs incurred during the Period of Restoration that are over and above the total costs that would normally have been incurred during the same period of time had no loss or damage occurred. Extra expense shall include, but not be limited to equipment rental, emergency expenses, temporary use of property, demobilization and remobilization of equipment and facilities and expenses necessarily incurred to reduce loss excluding, however, any additional interest expense, debt service, business interruption, loss of

income, loss of earnings, loss of rents or delay in completion and/or acceleration expense.

Period of Restoration means the period of time that:

(a) Begins on the date of direct physical loss or damage at the **INSURED PROJECT\***; and

(b) Ends on the date when such property should be repaired, rebuilt or replaced with reasonable speed and similar quality, but not exceeding twelve (12) months.

(Exhibit 4 at 14–15.)

40.    The policy period for the Policies:

shall be effective on **August 7, 2023** at 12:01 A.M. local time at the location of the **INSURED PROJECT\***. Coverage ends at the earlier of the following

**A.** The Policy expires, effective **January 28, 2025** at 12:01 A.M. local time, at the location of the insured project

**B.** The owner or buyer accepts the property;

**C.** When the interest of the Named Insured ceases;

**D.** At the completion of the **TESTING PERIOD\***, if applicable;

**E.** Sixty (60) days after completion of the **INSURED PROJECT\***;

**F.** When the **INSURED PROJECT\*** is **OCCUPIED\*** or put to use for its intended purpose;

**G.** When the property is leased or rented to others;

**H.** When the Named Insured abandons the construction with no intention to complete it;

**I.** When permanent property insurance applies; or

**J.** When this Policy is cancelled;

The Policy Period includes a **TESTING PERIOD\*** not exceeding **NA** consecutive days.

(Exhibit 4 at 8.)

41.    The Policies allow for an extension to the policy period under the following terms:

With prior notification to the Insurer in writing, in the event the **INSURED PROJECT\***, excluding **HOT TESTING\*** and commissioning of equipment, has not been completed or accepted by the Owner, the Policy Period can be automatically extended for up to **1 (one) month** for a monthly rate of **$0.15/$100** of total project values subject to no risk aggravating situation at the time of the

10

extension request. The **TESTING PERIOD\*** can be extended an additional **NA** days for a rate of **$NA/$100** of total project values subject to no risk aggravating situation at time of the extension request. Any additional extensions for the construction period, or any extension of the **INSURED PROJECT\*** must be agreed to at the rates, premium and terms to be provided by the Insurer.

(Exhibit 4 at 8.)

42.     The Policies describe the policy territory as follows:

This Policy covers loss or damage occurring within the fifty (50) States comprising the United States of America, including the District of Columbia, except that the Insurer will not cover property in transit by water or air traveling to or from Alaska or Hawaii regardless of origin of shipments.

(Exhibit 4 at 8.)

43.     The Policies state that the Reservoir Project is located "on approximately 10,500 acres of land located west and south of LaBelle, Florida and south of SR 80 in western Hendry County, FL 33953." (Exhibit 4 at 8.)

44.     The Policies further describe the Reservoir Project as follows:

The Work in this contract includes, primarily, the installation of approximately 110,000 linear feet of flat plate, upstream and crest, soil cement slope protection for the reservoir embankment. Approximately 4,000 linear feet has been previously constructed. The work shall be in accordance with the plans, specifications, RFI's and approved submittals and attached to this request. The contractor will be responsible to provide quality control in accordance with the project's 3 phase quality control system. It is intended that the District will assign a quality control laboratory to the Contractor at a later date. The work includes all necessary dewatering, removal and disposal of upstream and crest overbuild materials, screening and/or processing of subgrade clean sands to meet project specifications, importing and placement of qualified FDOT drain materials, installation of drainage piping, piping inspections, installation of geotextile underlayment, placement and curing of soil cement flat plate and protection of installed work. The Contractor shall provide all survey, layout, grade and machine control as necessary to meet the requirements of the project and shall provide as built surveys during construction to verify subgrade and will be required to provide final as-built surveys to document completed construction. The District will furnish all drain piping materials and geotextile.

(Exhibit 4 at 8–9.)

11

45.     The Policies contain certain defined terms that are relevant to this litigation, including:

**4. <u>FLOOD</u>:**

    **A.** A general and temporary condition of partial or complete inundation of normally dry land areas, including dewatered areas, from:

        **1.** The overflow of inland or tidal waters;

        **2.** The unusual and rapid accumulation or runoff of surface water;

        **3.** Tsunami; or

        **4.** Storm surge.

    **B.** Mudslides (i.e. mudflows) which are caused by flooding as defined in Section V-5.A. above and are akin to a river of liquid and flowing mud on the surfaces of normally dry land areas, as when earth is carried by a current of water and deposited along the path of the current;

    **C.** Surface water being seepage, leakage or influx of water (immediately derived from natural sources) through sidewalks, driveways, foundations, walls, basements or other floors, or through doors, windows or any other openings in such sidewalks, foundations, walls or floors; and shall also include all water which backs up through sewers and drains;

    **D.** The collapse or subsidence of land along the shore of a lake or other body of water as a result of erosion or undermining caused by waves or currents of water exceeding the cyclical levels which result in flooding as defined in Section V-5.A. above;

The peril of "**FLOOD\***" is intended to be inclusive of all representative appearances of the word "flood" regardless of capitalization, font, or other text enhancements[.]

***

**8. <u>OCCURRENCE</u>:**

With the exception of the perils of EARTH MOVEMENT\*, FLOOD\*, NAMED WINDSTORM\*, WINDSTORM\*, riot, riot attending a strike, civil commotion, and vandalism and malicious mischief, OCCURRENCE\* means an accident, incident, or a series of accidents or incidents arising immediately

out of a single event or originating cause and includes all resultant or concomitant losses wherever located.

In respect of the perils of EARTH MOVEMENT\*, FLOOD\*, NAMED WINDSTORM\*, WINDSTORM\*, riot, riot attending a strike, civil commotion, and vandalism and malicious mischief, OCCURRENCE\* shall mean all losses arising during a continuous period of seventy-two (72) hours during the Policy Period. The Insured may elect the moment when the seventy-two (72) hour period begins, which shall not be earlier than when the first loss to the insured property occurs, and no two such periods shall overlap. Such EARTH MOVEMENT\*, FLOOD\*, NAMED WINDSTORM\*, WINDSTORM\*, riot, riot attending a strike, civil commotion, and vandalism and malicious mischief shall be deemed to be a single OCCURRENCE\* within the meaning of this Policy. The Insurer shall not be liable for any loss commencing before the effective date and time or commencing after the expiration date and time of this Policy.

\*\*\*

12. <u>**TOTAL CONTRACT VALUE:**</u>

The total value of all property insured including, but not limited to, all wages, expenses, materials, supplies, equipment, existing structures (when coverage is included) and such other charges, all whether provided by the owner, contractors or others, which will become a part of or will be expended in the project plus the value, if any, of SOFT COSTS/ADDITIONAL EXPENSES\*, RENTAL INCOME\* or GROSS EARNINGS\* to be insured. Refer to Delay in Completion Endorsement, if so endorsed to this Policy, for definitions of SOFT COSTS/ADDITIONAL EXPENSES\*, RENTAL INCOME\* and GROSS EARNINGS\*.

13. <u>**WATER DAMAGE:**</u>

Means physical loss or damage as covered by this Policy which is a result of, liquids, gases and/or similar media, leakage of fluids, whether wind driven or not, caused by other than the peril of **FLOOD\***.

14. <u>**WINDSTORM:**</u>

The direct action of wind - with or without precipitation, or the direct action of hail (regardless whether hail is accompanied by wind) including such events as hurricane, typhoon, rainstorm, hailstorm, tornado, or any combination of the foregoing events.

(Exhibit 4 at 29, 31–32.)

### (1) *The Policies' Limits of Liability & Deductibles*

46.     The Policies' total limit of liability is $102,448,034, "subject always to the Sublimits and Annual Aggregate Limits of Liability set forth below…" (Exhibit 4 at 9.)

47.     The Policies' Sublimits of Liability section states: "[t]he Insurer shall not be liable for more than its share of the following Sublimit(s) of Liability in any one **OCCURRENCE\***. In no event shall these Sublimit(s) of Liability increase the Limit or Annual Aggregate Limits of Liability[.]" (Exhibit 4 at 9.)

48.     The Policies then set forth various Sublimits of Liability depending on the peril at issue.

49.     The Sublimit of Liability applicable to losses resulting from the peril of "**WATER DAMAGE**," as defined in the Policies, is $25,000,000. (Exhibit 4 at 10.)

50.     The Policies also include Sublimits of Liability applicable to many of the coverage extensions contained therein, including "[for Debris Removal,] $1,000,000 or 25% of the amount of insured physical loss of or damage to property insured[,] whichever is less[;]… $5,000 [for] Claims Preparation Fees; [and, for Contractor's Extra Expense,] $250,000 or 25% of the Insured physical loss of or damage to property insured, whichever is less[.]" (Exhibit 4 at 9–10.)

51.     The Policies contain Annual Aggregate Limits of Liability, which provide that:

> the maximum amount the Insurer will pay for loss or damage from any one **OCCURRENCE\***, and/or in the aggregate for loss or damage from all occurrences, in any twelve consecutive months, shall not exceed the following amounts for the following perils unless otherwise limited by the Sublimit(s) of Liability stated above[.]

(Exhibit 4 at 10.)

52.     There is a $25,000,000 Annual Aggregate Limit of Liability for loss or damage:

caused by, resulting from, contributed to or aggravated by the peril of **FLOOD**\*[,] except[] [that which is] caused by, resulting from, contributed to or aggravated by the peril of **FLOOD**\* in Special Flood Hazard Areas on the National Flood Insurance Program ("NFIP") maps (all Zones beginning with the designation A or V) and those areas labeled Zone B or Zone X (shaded), as defined by the Federal Emergency Management Agency ("FEMA")

(Exhibit 4 at 10–11.)

53.    The Policies have different deductibles depending on the peril at issue and set

forth deductibles as follows:

From the amount of each claim for insured loss or damage arising out of any one **OCCURRENCE**\*, there shall be deducted the applicable amount shown below, and then the liability of the Insurer shall be only for the amount of such insured loss or damage in excess thereof, subject to the Limit of Liability, Sublimits of Liability or Annual Aggregate Limits of Liability set forth above:

A. $250,000 physical loss or damage; except:

B. $500,000 physical loss or damage from **WATER DAMAGE**\*

\*\*\*

D. $1,000,000 physical loss or damage from the peril of **FLOOD**\* or 5% of the total **INSURED PROJECT**\* values at risk at the time and place of loss, whichever is greater.

\*\*\*

G. $250,000 physical loss or damage from the peril of **WINDSTORM**\*

In the event that more than one physical loss or damage deductible shown above or specified in any endorsement issued hereunder shall apply to insured physical loss or damage in any one OCCURRENCE\*, only the largest shall be applied.

If the Delay In Completion Endorsement applies to this Policy, the specified deductible or waiting period deductible shall apply in addition to the physical loss or damage deductible.

(Exhibit 4 at 12.)

### *(2) The Dams, Dikes, Levees and Reservoirs Endorsement (Endorsement No. 5)*

54.    The Policies also contain endorsements that add, remove, or modify policy terms.

15

55.    The "Dams, Dikes, Levees and Reservoirs Endorsement" ("Endorsement No. 5")

purports to modify certain terms and conditions in the Policies.

56.    With respect to exclusions, Endorsement No. 5 states:

When coverage under the IRONSHORE COMPETED VALUE BUILDERS RISK POLICY FORM is provided for the construction of dams, cofferdams, dikes, levees, reservoirs and related works, the following additional exclusions apply:

The following is added to paragraph **2. PERILS EXCLUDED** of **SECTION III – EXCLUSIONS**:

Dams, Cofferdams, Dikes, Levees, Reservoirs and Related Works

1.  Grouting of soft rock areas or other additional safety measures even if their necessity arises only during construction;

2.  Expenses incurred for dewatering regardless of whether the quantity of water expected is exceeded;

3.  Loss or damage due to breakdown of the dewatering system if such breakdown could have been avoided by sufficient stand-by facilities;

4.  Expenses incurred for additional sealing or waterproofing and additional facilities for the discharge of run-off and/or underground water;

5.  Loss or damage due to subsidence if caused by insufficient compacting

6.  Expenses incurred for the repair of cracks in any concrete and leakage therefrom, except that which results in direct physical loss or damage insured by this Policy; or

7.  Expenses incurred for the repair of eroded slopes or other graded areas.

(Exhibit 4 at 37.)

57.    Endorsement No. 5 also purports to modify the Policies' "Valuation" clause.

58.    Specifically, the Policies' "Valuation" clause provides as follows:

**25. <u>VALUATION</u>**

Subject to the applicable Limit, Sublimit or Aggregate Limit of Liability as the case may be, the basis of adjustment of a claim at the time of loss, unless otherwise endorsed herein, shall be as follows:

A. Property Under Construction – The cost to repair or replace the lost or damaged property, valued as of the time and place of loss, with material of like kind and quality, less betterment, including contractor's reasonable profit and overhead in the same proportion as that included in the original contract documents. If lost or damage property is not so repaired or replaced, loss shall be settled on an Actual Cash Value;

B. Temporary Works – The Actual Cash Value of the lost or damaged property valued as of the time and place of loss;

C. Property Of Others (including items supplied by the owner or for which the Insured is legally responsible) - The lesser of the cost to repair or replace the property lost or damaged with material of like kind and quality, or the amount the Insured is legally obligated to pay for direct physical loss or damage by reason of the Insured's assumption of liability for such loss or damage prior to the loss;

D. Plans, Blueprints, Drawings, Renderings, Specifications Or Other Contract Documents And Models – The cost to reproduce with property of like kind and quality including the cost of gathering or assembling information from back up data if replaced. If not replaced - the value of blank material;

E. Trees, Shrubs, Plantings And Landscaping - The cost to replace with property of like kind, quality and size plus the proper proportion of labor expended if such damage occurs after installation;

F. Property In Transit – The invoice cost plus accrued shipping charges less shipper's liability, if any.

G. Existing Property – If actually replaced, the cost to repair or replace the property lost or damaged, at the time and place of loss, with material of like kind and quality less betterment; if not so replaced the loss shall be settled on basis of Actual Cash Value.

Actual Cash Value shall mean the amount it would cost to repair or replace the lost or damaged property, at the time and place of loss, with material of like kind and quality, with proper deduction for obsolescence and physical depreciation.

(Exhibit 4 at 27.)

59.    Endorsement No. 5 purports to modify this clause and provides:

The following is added to paragraph **25, Valuation** of Section **IV** – General Conditions with respect to coverage provided in this endorsement:

17

> The cost to repair, rebuild or replace dams, dikes, reservoirs and levees, to technically equivalent standards that existed immediately before the time of loss or damage will not exceed 100% percent [sic] of the original average cost per linear foot of the construction cost of the actual damaged area.

(Exhibit 4 at 37.)

60.    Endorsement No. 5 also states that:

> With respect to the construction of dams, dikes, reservoirs and levees, the definition of **FLOOD\*** under **SECTION V., DEFINITIONS**, is replaced by the following:

**4.  <u>FLOOD</u>:**

    **A.** A general and temporary condition of partial or complete inundation of normally dry land areas, including dewatered areas, from:

        **1.** The overflow of inland or tidal waters;

        **2.** The unusual and rapid accumulation or runoff of surface water;

        **3.** Tsunami; or

        **4.** Storm surge.

    **B.** Mudslides (i.e. mudflows) which are caused by flooding as defined in Section V-4.A. above and are akin to a river of liquid and flowing mud on the surfaces of normally dry land areas, as when earth is carried by a current of water and deposited along the path of the current;

    **C.** Surface water being seepage, leakage or influx of water (immediately derived from natural sources) through sidewalks, driveways, foundations, walls, basements or other floors, or through doors, windows or any other openings in such sidewalks, foundations, walls or floors; and shall also include all water which backs up through sewers and drains;

    **D.** The collapse or subsidence of land along the shore of a lake or other body of water as a result of erosion or undermining caused by waves or currents of water exceeding the cyclical levels which result in flooding as defined in Section V-4.A. above;

    **E.** Partial or complete inundation of dams, dikes, reservoirs and levees from water whatever the source.

The peril of "**FLOOD\***" is intended to be inclusive of all representative appearances of the word "flood" regardless of capitalization, font, or other text enhancements.

(Exhibit 4 at 38.)

### D. The Present Insurance Coverage Dispute

61. On June 19, 2024, Plaintiff provided the Carriers with notice of its claim for coverage for the loss resulting from the June 2024 Storm Event (the "Claim").

62. Upon receipt of notice from Plaintiff, the Carriers retained Engle Martin to adjust the Claim.

63. On June 21, 2024, a representative from Engle Martin traveled to the Reservoir Project and performed a site inspection, observing the damage from the June 2024 Storm Event.

64. On June 24, 2024, Engle Martin issued a set of requests for information to Plaintiff (the "First RFI Letter").

65. Plaintiff provided the Carriers with responses to the First RFI Letter on July 25, 2024.

66. On September 25, 2024, the Carriers, through their adjuster Engle Martin, issued a reservation of rights letter to Plaintiff (the "September ROR Letter" is attached as Exhibit 9).

67. In the September ROR Letter, the Carriers asserted that the damages sustained at the Reservoir Project were the result of "**FLOOD**," as defined by the Policies. (Exhibit 9 at 1.)

68. The Carriers also argued that the Policies' **FLOOD** deductible should apply to Plaintiff's Claim and calculated the applicable deductible as being $4,378,643.44. (Exhibit 9 at 2–3.)

69. The September ROR Letter further "direct[ed] [P&J's] attention" to the exclusions and policy modifications found in Endorsement No. 5. (Exhibit 9 at 3–5.)

70. However, the September ROR Letter also stated that, "[g]iven that this claim is still in its investigative stage, it is yet to be determined whether any of the above limitations or exclusions are applicable." (Exhibit 9 at 5.)

71. At the time of the September ROR Letter, the Carriers and Engle Martin were continuing to evaluate coverage for Plaintiff's Claim under the Policies.

72. In a letter dated November 4, 2024, Plaintiff provided the Carriers with its first claim submission, including damages schedules for costs incurred between June 10, 2024 and August 31, 2024 as a result of the June 2024 Storm Event, and an accompanying claim narrative (the "First Payment Application").

73. The First Payment Application sought recovery of $4,464,045 under the Policies.

74. On January 23, 2025, P&J provided the Carriers with a second claim submission, which included supplemental damages schedules and a brief narrative concerning costs incurred from September 2024 through November 2024 (the "Second Payment Application").

75. The Second Payment Application sought an additional $1,330,983 under the Policies.

76. Through its First Payment Application and Second Payment Application, Plaintiff sought to recover from the Carriers $5,795,028 in total costs resulting from the June 2024 Storm Event.

77. On March 4, 2025, Plaintiff, through its coverage counsel, issued a letter to the Carriers and Engle Martin requesting a reevaluation of their position on Plaintiff's Claim (the "March 2025 Letter" is attached as Exhibit 10).

78.    The March 2025 Letter considered each element of the "**FLOOD**" definition, as modified in Endorsement No. 5, and demonstrated that the June 2024 Storm Event did not fall within that definition. (Exhibit 10 at 3–5.)

79.    P&J asserted that damage to the Reservoir Project was caused by the storm and the intensity and frequency of the rain hitting the work during the June 2024 Storm Event.

80.    Specifically, the March 2025 Letter established that the damage from the June 2024 Storm Event did not originate from one of the sources specified within the definition of "**FLOOD**" as set forth in Endorsement No. 5. (Exhibit 10 at 4.)

81.    Further, the March 2025 Letter noted that subpart E in the "**FLOOD**" definition, as modified by Endorsement No. 5, contains the word "inundation[,]" which is not defined by the Policies. (Exhibit 10 at 4–5.)

82.    The Carriers (through their coverage counsel, Zelle LLP) responded to Plaintiff's March 2025 Letter by letter dated May 12, 2025 (the "May 2025 Letter" is attached as Exhibit 11).

83.    The May 2025 Letter dismissed P&J's interpretation of the Policies' "**FLOOD**" definition.

84.    In the May 2025 Letter, the Carriers alleged that the damage caused by the June 2024 Storm Event was the result of "the unusual and rapid accumulation or runoff of surface water" and "partial or complete inundation of the reservoirs from rain water." (Exhibit 11 at 2.)

85.    The May 2025 Letter reasserted the Carriers' position that the Policies' **FLOOD** deductible (totaling $4,378,643.44) applies to Plaintiff's Claim. (Exhibit 11 at 2.)

86.    Taking the next step to eliminate coverage for P&J, on June 16, 2025, the Carriers (through Engle Martin) issued a letter to Plaintiff explaining for the first time their interpretation

of the Policies' Valuation clause and its purported application to Plaintiff's Claim (the "June 2025 Letter" is attached as Exhibit 12).

87.     In their June 2025 Letter, the Carriers broke down the Reservoir Project into four "phases," but provided no citations to policy language or law that would support their new "phased" approach. (Exhibit 12 at 3.)

88.     The Carriers then used their new "phases" to lower their "valuation" of Plaintiff's Claim and craft an argument further eliminating any chance of recovery under the Policies.

89.     Drawing from documents Plaintiff provided nearly a year earlier in its response to Engle Martin's First RFI Letter, the Carriers divided the Reservoir Project into four "phases" and then assigned different construction cost values to each phase. (Exhibit 12 at 3–5.)

90.     The Carriers then applied these fictional "values" to the damage at the Reservoir Project site. (Exhibit 12 at 3–5.)

91.     According to the June 2025 Letter, based on the Carriers' calculation, "the total insured amount of the claimed damage shall not exceed $1,030,783.65[.]" (Exhibit 12 at 5.)

92.     Because the Carriers' valuation of Plaintiff's Claim is substantially lower than the **FLOOD** deductible they calculated, the Carriers have taken the position that Plaintiff is not entitled to any payment under the Policies.

93.     Despite acknowledging that Plaintiff's Claim is covered by the Policies and that Plaintiff provided two comprehensive, well-supported claim submissions, the Carriers maintain their refusal to reimburse Plaintiff for any of the costs arising from the June 2024 Storm Event. (Exhibit 12 at 5.)

94.     Through their conduct, the Carriers and their claims representatives have sought to strip P&J of the coverage it paid for, employing strained policy interpretations that render the Policies meaningless and denying payment altogether.

95.     Notwithstanding the Carriers' position that no coverage was owed under the Policies (issued just the day before), on June 17, 2025, the Carriers (this time through their construction consultants, DBI Consultants) issued a second set of requests for information to Plaintiff (the "Second RFI Letter").

96.     The Second RFI Letter was issued one day after the Carriers effectively denied coverage to P&J and eight months after P&J's First Payment Application to the Carriers.

97.     The Second RFI Letter purports to seek information from Plaintiff that the Carriers claim is necessary for DBI Consultants to evaluate the costs submitted in the Claim.

98.     The Second RFI Letter contains 32 separate requests, inclusive of subparts, and in many instances seeks information already in the possession of the Carriers or their claim representatives.

99.     On July 18, 2025, Plaintiff filed a complaint against the Carriers in the U.S. District Court for the Middle District of Florida, alleging that the Carriers breached the Policies by failing and refusing to pay Plaintiff's covered Claim.

100.    Insisting that they did not "deny" coverage to Plaintiff, the Carriers responded to Plaintiff's complaint by invoking the mediation process set forth in Fla. Stat. § 627.70152(4)(b).

101.    Accordingly, on August 25, 2025, Plaintiff and Ironshore filed a joint stipulation for dismissal without prejudice.

102.    On November 11, 2025, the parties had an unsuccessful mediation.

103.    Plaintiff has now filed suit once again to recover for its covered losses under the Carriers' Policies.

104.    Plaintiff has fulfilled all conditions precedent to filing this lawsuit.

## Count One – Declaratory Judgment

105.    P&J repeats and realleges paragraphs 1 through 104 hereof, as if fully set forth herein.

106.    P&J and the Carriers have asserted competing interpretations of the Policies' definition of "**FLOOD**" and the Policies' Valuation clause.

107.    With respect to the peril of **FLOOD**, P&J states that the facts of the June 2024 Storm Event and its Claim do not fall within the scope of the Policies' definition.

108.    Further, the Carriers have failed to demonstrate that Plaintiff's Claim was caused by an "inundation" as required to satisfy the Policies' definition of "**FLOOD**."

109.    In the alternative, P&J asserts that the undefined word "inundation" found in the Policies' "**FLOOD**" definition and Endorsement No. 5 creates an ambiguity, which should be resolved in favor of P&J as policyholder.

110.    P&J also disputes the Carriers' interpretation and application of the Valuation language in Endorsement No. 5 to its Claim.

111.    The parties' competing interpretations of these portions of the Policies create a bona fide, actual, and present practical need for a declaration of P&J's contractual rights under the Policies.

112.    Because P&J's Claim concerns the June 2024 Storm Event and the losses arising therefrom, the declaration sought in Count One deals with a present, ascertained, or ascertainable state of facts or present controversy.

113.    P&J's rights under the Policies, including its rights to recovery for the costs submitted in its Claim, are dependent upon the facts alleged herein and the law applicable to those facts.

114.    The Carriers have an actual, present adverse interest in the subject matter of Count One brought by P&J.

115.    No other entity has an actual, present adverse interest in the subject matter of Count One, such that all adverse parties are presently before the Court.

116.    The relief sought by P&J in Count One is not an advisory opinion, but rather the resolution of a present controversy between the parties to this litigation.

## Count Two – Breach of Contract

117.    P&J repeats and realleges paragraphs 1 through 116 hereof, as if fully set forth herein.

118.    The Policies constitute valid contracts between Plaintiff and the Carriers.

119.    Plaintiff has relied upon and performed under the Policies.

120.    As a result of their misinterpretations and misapplications of various terms in the Policies, including the "**FLOOD**" definition and the Valuation clause, the Carriers have refused to tender any payments to P&J for costs resulting from the June 2024 Storm Event.

121.    The Carriers' refusal to pay the amounts owed to Plaintiff under the Policies represents a breach of their contractual obligations under the Policies.

122.    As a result of the Carriers' failure to provide payment for P&J's costs, as required by the terms of the Policies, P&J has suffered damages in the amount of $5,795,028.

**WHEREFORE**, Plaintiff, Phillips & Jordan, Inc., respectfully requests the entry of judgment as follows:

(1)    On Count One, declaring that the June 2024 Storm Event does not fall within the Policies' definition of the peril of "**FLOOD**", and thus that the Policies' provisions, exclusions, and endorsements pertaining to **FLOOD** do not apply to P&J's Claim;

(2)    On Count One, declaring that the Valuation language set forth in Endorsement No. 5, by its terms, does not permit Defendants' "phased" approach to valuing Plaintiff's Claim;

(3)    On Count One, declaring that "the original average cost per linear foot of the construction cost" in the Valuation language set forth in Endorsement No. 5, by its terms, refers to the overall cost of the Reservoir Project divided by the total linear feet of the Project;

(4)    On Count One, declaring that "the actual damaged area" in the Valuation language set forth in Endorsement No. 5, by its terms, refers to the size of the damaged area in linear feet;

(5)    On Count Two, finding that the Carriers are in breach of their obligations under the Policies and awarding damages as against the Carriers in the amount of $5,795,028 (minus the applicable deductible), plus interest and costs;

(6)    Awarding P&J pre-judgment interest, court costs, expert fees, and attorneys' fees; and

(7)    Awarding such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all issues triable as a matter of right by a jury.

Dated: November 14, 2025                    Respectfully submitted,

                                            */s/W. Hampton Johnson IV*
                                            W. HAMPTON JOHNSON IV
                                            FLA. BAR NO. 98607
                                            **Lead Counsel for Plaintiff**
                                            **Phillips & Jordan, Inc.**
                                            JOHNSON, ANSELMO, MURDOCH,
                                            BURKE, PIPER & HOCHMAN, P.A.
                                            2455 E. Sunrise Blvd., Suite 1000
                                            Fort Lauderdale, FL 33304
                                            954-463-0100-Tel./954-463-2444-Fax
    **Primary Service email:**              whjohnson@jambg.com
    **Secondary Service emails:**           OStruemke@jambg.com
                                            thiggins@jambg.com